**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NANCY RADFORD, AND KAYCEE FARLAND, on behalf of themselves and all others similarly situated, | )<br>)<br>)<br>) |
| Plaintiffs, | )  Case No.. _____ |
| vs. | )<br>)  Honorable _____ |
| TOWN SPORTS INTERNATIONAL HOLDINGS, INC. and TOWN SPORTS INTERNATIONAL, LLC, d/b/a New York Sports Clubs, Boston Sports Clubs, Washington Sports Clubs, Philadelphia Sports Clubs, Lucille Roberts, Palm Beach Sports Clubs, Around the Clock Fitness, and Total Woman Gym and Spa. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | ) |

## CLASS ACTION COMPLAINT AND JURY DEMAND

## INTRODUCTION

1. Plaintiffs NANCY RADFORD, and KAYCEE FARLAND ("Plaintiffs"), by and through their counsel, file this Class Action Complaint against TOWN SPORTS INTERNATIONAL HOLDINGS, INC. and TOWN SPORTS INTERNATIONAL, LLC (collectively "Defendants" or "TSI"), on behalf of themselves and on behalf of a class of similarly situated individuals, and allege, upon personal knowledge as to their own actions, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

2. While the American public endures a public health and economic crisis from the Covid-19 virus that confronts millions of middle class individuals and families to make agonizing budgetary choices, TSI, a publicly traded corporation that takes in over $400 Million per year in annual revenue, has made the unconscionable decision to shift its own financial burden of the crisis

1

solely onto its loyal customers.

3.      TSI is one of the largest owners and operators of fitness clubs in the United States, with its largest footprint in the American Northeast and Mid-Atlantic regions.

4.      As of December 31, 2019, TSI owned and operated 186 fitness clubs in at least 9 states, plus Washington D.C, with over 600,000 members.

5.      While everyone is feeling the capital and liquidity strain of a global pandemic, TSI has chosen to continue seizing funds from its members, and appropriate it for its own purposes, while its fitness clubs are shut down and its services discontinued.

6.      Plaintiffs, on behalf of a nationwide class of similarly situated Americans making sacrifices in their own lives, bring this action against TSI to recover money wrongly taken and misappropriated in violation of contract, common law, and consumer protection laws.

## PARTIES

7.      Plaintiff Nancy Radford is an individual and citizen of Massachusetts.

8.      Plaintiff Kaycee Farland is an individual and citizen of Massachusetts.

9.      Defendant Town Sports International Holdings, Inc. is a Delaware Corporation with its principal place of business in New York.

10.      Defendant Town Sports International, LLC is a limited liability company organized under the laws of New York, with its principal place of business in Elmsford, New York.

## JURISDICTION

11.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2).  The amount in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are numerous class members who are citizens of states different from Defendants.  The number of members of the proposed class is in the aggregate greater than 100.

12.     This Court has personal jurisdiction over Defendants because they are citizens of New York, they conduct significant, substantial, and not-isolated business activities in New York, and a substantial portion of the acts complained of took place in New York.

13.     Venue is proper in the Southern District of New York because Defendants reside in this District, conduct business in this District, and many of the events that gave rise to Plaintiffs' claims occurred in this District.

## FACTUAL BACKGROUND

14.     TSI owns (including the use of wholly owned subsidiaries) and operates health and fitness clubs in New York, New Jersey, Connecticut, Massachusetts, Rhode Island, Maryland, Pennsylvania, California, Florida, and Washington D.C.

15.     TSI boasts over 600,000 members at approximately 186 clubs under a variety of brand names, including New York Sports Clubs, Boston Sports Clubs, Washington Sports Clubs, Philadelphia Sports Clubs, Lucille Roberts, Total Woman Gym and Spa, Palm Beach Sports Clubs, and Around the Clock Fitness.

16.     Membership funded revenue comprises the lions' share of TSI's revenue. In both 2018 and 2019, membership-based funds comprise more than 75% of TSI's total revenue.

17.     Each of TSI's brand websites (Boston Sports Clubs, Philadelphia Sports Clubs, etc.) share common features, common membership policies, common logos, and virtually identical information.



18.     Each of TSI's brand social media pages share a common banner and include virtually identical content commonly generated by TSI's corporate employees.



19.     The company is commonly operated and managed from a common source at the corporate level, and the policies implemented at each club are substantially similar, if not identical, irrespective of brand or title on the front of each facility.

### *TSI Membership Agreements*

20.     TSI's membership agreements memorialize a very simple bargain between buyer and seller; TSI offers health club access and health and fitness services in exchange for regular membership dues, ancillary services, and fees (which TSI is prolific at charging).

21.     The terms of TSI's membership agreements are substantively common between its brands and locations.

22.     Generally, the terms of the agreement are described orally to customers by a TSI sales representative, and the agreement is entered through an electronic medium.

23.     Most TSI members have never seen or received a paper copy of their membership agreements.

24.     Membership is typically initiated electronically and entered at the direction of, or directly by, a TSI sales consultant.

25.     TSI offers one-year "commit" contracts, in addition to a "month-to-month" membership.

26.     Monthly membership dues are the primary, although (importantly) not the exclusive, source of TSI's membership-based revenue.

27.     Under the agreements, members pay a monthly membership fee ranging from approximately $20 to $120, exclusive of fees and ancillary services.

28.      TSI assesses charges for personal training and other ancillary programs, such as kids sports clubs and small group training programs.

29.     TSI assesses substantial charges for a "Joining Fee" and an "Annual Fee."

30.     Based on the level and cost of membership, customers are either given access to a single home gym or "passport" access to a number of TSI's other locations.

31.     When a "commit" period is over, customers retain membership on a month-to-month basis until they choose to cancel.

32.     The membership agreements provide that in the case of a membership cancellation, the health and fitness services provided under the agreement will continue to be provided until any cancellation becomes effective.

33.     Under TSI's membership agreements, "month-to-month" members generally have

the right to cancel at any time without penalty.

34.     One-year "commit" memberships can generally be cancelled at any time for a specified cancellation fee.

35.     As of December 31, 2019, more than 85% of TSI's total members were "month-to-month."

36.     For financial reporting purposes, TSI counts revenue derived from monthly membership dues and ancillary services like personal training "***in the month when the services are rendered***." TSI counts revenue from initiation and processing fees over the estimated average membership life. TSI counts revenue from annual fees over a twelve-month period.

37.     When a member joins on any day after the 1st day of the month, TSI prorates the monthly membership due to charge only the days which the member was eligible to receive its club access and health and fitness services.

38.     TSI estimates that 99% of its members make their payments of monthly membership dues and fees through electronic fund transfers ("EFT").

39.     TSI relies heavily on automatic EFT income based on memberships that proceed on a "month-to-month" basis.

40.     TSI automatically processes outstanding balances from membership and fees through EFTs on a monthly basis, on the first day of every month.

41.     The membership dues, ancillary service charges, and fees paid by TSI's customers through EFTs are rendered solely in exchange for gym access and in-person health and fitness services, which it is TSI's duty to provide.

42.     TSI's Membership Agreements are substantially similar across all of clubs and brands.

43.     But the bargain is quite simple: members pay dues, charges, and fees to TSI in exchange for access to TSI's facilities and health and the fitness services offered by TSI at its clubs.

### TSI's Despicable Response to the COVID-19 Crisis

44.     On March 11, 2020, the World Health Organization (WHO) declared the outbreak of the novel Covid-19 virus a pandemic.

45.     Meanwhile, Government officials and public health officials across the country were issuing varying degrees of warnings and orders to minimize social contact, including "shelter-in-place" orders, and prohibitions on public gatherings.

46.     TSI correctly announced that it would be closing all if its clubs because of the Covid-19 pandemic effective on March 16 at 8pm, with the following banner posted on all of its web pages:

**Emergency Alert!**
In adherence with State and Federal guidelines concerning COVID-19, also known as Coronavirus, we will be temporarily closing all of our clubs starting 8PM on March 16th until further guidance from the state government. We will miss all of our valued members and whenever this passes we'll be back at our clubs waiting for you. Read More.

47.     TSI also announced immediate layoffs of its entire staff throughout the organization, sparing only executive leadership.

48.     Many members learned about the gym closures because of signs posted on the doors of the shuttered gyms, and people universally wondered what it would mean for their membership status.

49.     Because the clubs had been stripped of all employees and staff, down to the janitorial staff, TSI provided nobody to field inquiries and requests to cancel, or at minimum "freeze," their memberships without charge while club services were unavailable.

50.     On March 23, 2020, TSI terminated its Chief Financial Officer Helen Van Ness, and appointed its Vice President of Business Operations to the position. Another board member

resigned shortly before.

51.     Members' calls, emails, and social media posts went entirely unanswered and ignored.

52.     Ten days after the closure, and after hundreds attempted to freeze or cancel their memberships, TSI CEO Patrick Walsh sent an email blast to members apologizing for the delayed response and stating: "Rest assured, once we're up and running our clubs we will handle all of your concerns, including credits to your memberships, and personal training sessions."

53.     This message unmistakably conveyed that TSI would not be providing refunds, in clear violation of existing contract, common law, and consumer protection statutes.  This is made even more remarkable by the fact that TSI laid off its staff, raising obvious questions about the purpose of the ill-gotten revenues.

54.     TSI members, many of whom were facing personal economic crises and tough choices of their own in order to make ends meet, were in disbelief.

55.     On March 31, Patrick Walsh sent out another email offering certain online fitness streaming programs to members in addition to a "passport" membership to other TSI Clubs, an entirely empty and uncertain benefit under the circumstances.

56.     Mr. Walsh again communicated that refunds would not be offered, instead discussing only "credits."

57.     Mr. Walsh knowingly omitted from his communications to members that members have a legal right to cancel their memberships, and they do not have an obligation to pay for health and fitness services which they do not, and cannot receive.

58.     The company's SEC filings make plain that month-to-month members have an unambiguous right to cancel at any time at no cost, even when services are being provided.

59.     The timing of this March 31 email from Mr. Walsh is significant, as he knew that all member accounts are charged on the first of each month. Yet, he omitted any and all information regarding whether member accounts would continue to be charged, and funds seized for services that he knew would not be provided. He also provided no information on how to cancel or freeze memberships to avoid such charges.

60.     Then, on April 1, in a flurry of EFT transactions, thousands of TSI members spanning all the states and territories in which they operate were charged, and tens of millions of dollars seized from them by TSI.

61.     When members realized their accounts were once again charged, the response was, understandably, resounding outrage.



62.     On April 1, 2020, only after TSI seized millions of dollars unlawfully, TSI sent

another email from Mr. Walsh, adding that members can opt to "freeze" accounts by emailing memberhelp@tsiclubs.com.

63.     However, what Mr. Walsh conveniently omitted is that TSI started baselessly charging a "freeze fee" for any individuals who followed the instructions and demanded to "freeze" their accounts.

64.     Mr. Walsh and TSI knowingly omitted any reference to the "freeze fee" from this communication and once again withheld information regarding members' existing cancellation rights during the period of closure, representing a false, misleading communication that omitted material information.

65.     Member requests to cancel memberships have not been honored and continue to be ignored—forcing people into "freeze" charges. Members' right to cancel have been universally denied, while TSI continues its money grab and invents new ways, including "freeze fees," prorating monthly dues after a freeze request, and refusing to prorate annual fees, to continue extracting maximum capital from its members.

66.     The "freeze fees" are being assessed, and cancellations denied, despite the fact that month-to-month members had an existing right to cancel at any time at no cost.

67.     Members are being unilaterally forced to extend or continue memberships that they do not want to extend or continue, particularly in light of the spread of Covid-19, which presents continuing health risks that are likely to extend beyond the reopening of Defendants' clubs.

68.     This lack of interest in extended membership benefits comes as no surprise to Defendants, who reported the following in their most recent SEC 10-K Annual Report:

> *The Covid-19 pandemic appears likely to cause significant economic harm across the United States, and the negative economic conditions that result may reduce consumer demand in our industry. We may experience a material loss of customers, revenue and market share as a result of the suspension of our operations.* ***We expect***

*to experience a significant increase in membership terminations during this time, and we may be unable to recover these customers* … *Consumer habits may also be altered in the medium to long term by restrictions on movement which may increase the prevalence of home, amenity or virtual gym arrangements that compete with our clubs. Negative economic conditions, a decrease in our revenue and consequent longer term trends harmful to our business may all exert pressure on our Company during the pendency of emergency restrictions on our operations and beyond.*

69.     Even before the extent of this crisis crystalized, Defendants knew that a substantial number of its customers would desire and demand to cancel, or at minimum freeze, their health club memberships pending the reopening of our society and economy.  Defendants knew that their customers would not want to continue memberships until they could be confident that going to health and fitness clubs is safe. Yet, Defendants made the conscious choice to extract as much money as possible during the height of the crisis so they can survive comfortably while others struggle.

70.     TSI has appropriated tens of millions of wrongly seized monies for its own purposes, including through membership dues, fees, and scheduled ancillary service charges.

71.     The value of cash and capital has never been higher nationwide, for individuals and companies alike, than during the Covid-19 pandemic.

72.     TSI has refused, and continues to refuse, direct refunds, even though required by statute, contract, and common law.

73.     TSI has profited unjustly by taking capital from its members, shutting down its clubs and their substantial overhead, and immediately laying off all its employees.

74.     The value of the capital wrongly seized is accruing daily, while TSI members are forced to take out debt to mitigate their losses caused by the crisis.

75.     Defendants' conduct towards their members, and their misleading, dishonest, and unfair representations, are unfair, unconscionable, disgraceful, and illegal.

11

*Plaintiffs' Factual Allegations*

**Nancy Radford**

76.     Nancy Radford has been a loyal member of the Boston Sports Clubs for more than a decade.

77.     Her home club is the South End gym on Harrison Avenue in Boston, Massachusetts.

78.     When she first started her membership, she believes that she signed a paper membership agreement.

79.     Ms. Radford has not signed any membership agreement since.

80.     She does not have an online account or login for the BSC website and does not know how to get one.

81.     Ms. Radford's monthly membership dues are $59.99 per month, in addition to other required fees and ancillary service charges. She has made payments and received club access and services regularly since becoming a member.

82.     News of the Covid-19 outbreak in the United States became dire in February 2020, and Ms. Radford decided that it was not personally safe for her to continue going to the gym and exercising her membership rights. In late-February 2020, she called into her home club and requested to cancel her membership for the month of March over the phone.

83.     Ms. Radford was laid off from one of her jobs because of the Covid-19 pandemic, and, for financial reasons in addition to her initial safety concerns, she needed to immediately cease payments for a gym membership that she did not want and could not use.

84.     A BSC employee instructed her over the phone that the only way to cancel was to come to the club in person. Ms. Radford did not feel that this was a safe option given the quickly accelerating spread of Covid-19.

85.     Ms. Radford attempted to cancel her membership online at the Boston Sports Club

website but was unable to do so, and unable to find necessary cancellation information.

86.     On March 28, Ms. Radford sent an email to heretohelp@bostonsportsclubs.com

requesting cancellation of her membership.

87.     Ms. Radford's cancellation request received the following automated response:

*To Our Members –*

*We appreciate you reaching out to us and apologize for the delay in responding.
For more information regarding your membership, please click on the link below.
Until we're all back in the gym, take care of each other and remember, we're all in
this together!
Stay well,*

*Your TSI Family*

*https://www.bostonsportsclubs.com/page/member-letter*

88.     The link led to a March 26 letter from CEO Patrick Walsh, with the following

language:[1]



---

[1] The link has recently updated to the most recent response, but the newest responses were unavailable to members contemporaneously.

89.     Ms. Radford's cancellation request was not honored. All that TSI promised was future "credits."

90.     Four days later, Ms. Radford was charged $59.99 for the month of March, despite her repeated cancellation efforts.

91.     On April 2, 2020 she emailed BSC Senior Business Director Andrew Zappala once again requesting cancellation. All he offered was future "credit" and an opportunity to "freeze" her membership, with no disclosure regarding whether "freeze fees" would be charged.

92.     Throughout her cancellation efforts, her home club was closed, and the entire staff was laid off. There was nobody available at BSC or TSI to field her communications or help correct the wrongful March charge to her account.

93.     TSI made it impossible for her to cancel her membership due to the Covid-19 crisis, during the time that the gym was closed and services not offered.

94.     Because of the financial strain and frustration caused by BSC, Ms. Radford disputed the March 2020 charges with her card with her credit card company and cancelled her card so that BSC could not continue to charge her dues for services she did not receive.

95.     She did not trust that BSC would stop charging her card if she opted to "freeze" her membership. She wanted to cancel membership, not freeze or receive future credit.

96.     Ms. Radford suffered monetary damages as a result of Defendants' unlawful charges to her account after her express statements that she did not authorize the charges to her card.

### Kaycee Farland

97.     Kaycee Farland became a Boston Sports Club member on or around April 2, 2019.

98.     She joined as a Regional Passport Member on a one-year commitment membership.

14

99.     Ms. Farland obtained membership in person at the Back Bay – Prudential Center club on Boylston Street in Boston.

100.     She spoke with a BSC employee, who instructed her to provide a credit card in order to start her membership. The BSC employee ran her credit card information to start payment. She was instructed to download the "passport" app for gym access.

101.     Ms. Farland recalls the BSC employee entering her account information into an electronic device.

102.     Ms. Farland was never provided with a copy of any membership agreement, paper or digital. She never signed any such agreement, in paper or digital form.

103.     Thereafter, Ms. Farland was provided with full access to the BSC club.

104.     Ms. Farland's dues were $69.99 per month, with a $69.99 annual fee.

105.     Ms. Farland paid her monthly dues through an electronic fund transfer, which was charged to the credit card on file on the same day of each month.

106.     Ms. Farland was charged $69.99 for the month of March.

107.     Her club closed on March 16, 2020 due to Covid-19, and Ms. Farland was unable to access any of the BSC facilities and services thereafter.

108.     On April 1, 2020, Ms. Farland's card was charged $69.99 for her monthly BSC membership payment for April.

109.     On April 2, 2020, Ms. Farland's card was charged again for $69.99, this time for the full amount of her BSC annual fee.

110.     On April 2, Ms. Farland sent an email to BSC Senior Business Director Andrew Zappala requesting cancellation of her membership and asked for information on "next steps."

111.     Mr. Zappala responded that no cancellation requests could be processed at the club

until the clubs reopen or by certified letter. Mr. Zappala did not provide the address to which any such cancellations could be made.

112.    Because the Back Bay – Prudential Center was closed, and all staff laid off, no BSC or TSI staff was available to receive and process member cancellation letters.

113.    Because her cancellation request was not honored, Ms. Farland responded by stating that she would like to "freeze" her account in the interim.

114.    Mr. Zappala responded that her freeze request will result in a "future credit towards your May dues," which he said would be only $4.67. He stated that Ms. Farland's "freeze" would be effective from 4/3 to 5/3, without any disclosure regarding whether "freeze fees" would be charged during that time.

115.    On April 3, 2020. Ms. Farland's card was charged once again in the amount of $4.67—payment for her May dues.

116.    Ms. Farland paid a total of $144.65 in a three-day period in which her club membership services were unavailable and not provided.  She paid dues for the full month of March, even though services were not provided from March 16 to March 31. She is also likely to pay a "freeze" fee, which TSI will reportedly apply to all "freeze" requests while its clubs are closed.

117.    Ms. Farland has been denied a refund, and all TSI offered in exchange was a "future credit" for May, when the club is likely to remain closed. This offer therefore carries no value, and Ms. Farland does not want "credit" towards a gym that is unlikely to be open or safe by that time.

### *Class Allegations*

118.    Plaintiffs bring this class action under Rule 23 and seek certification of the claims and issues in this action pursuant to the applicable provisions of Rule 23.  The proposed class is

defined as:

> All persons residing in the United States or its territories who were members of a TSI club as of March 16, 2020 who paid dues, fees, or ancillary service charges to TSI through an Electronic Fund Transfer for health and fitness services which they did not receive, and who have not received a refund. Excluded from the Class are (a) any person who has specifically requested a future membership credit, Plankk studio streaming access, or a "passport" upgrade in lieu of a refund; (b) all persons who are employees, directors, officers, and agents of either Defendants; (c) governmental entities; and (d) the Court, the Court's immediate family, and Court staff.

Plaintiffs reserve the right to amend or modify the Class definitions with greater specificity or division into subclasses after having had an opportunity to conduct discovery.

119. **Numerosity.** Fed. R. Civ. P. 23(a)(1). TSI has stated that it has more than 600,000 members, and 99% of these members utilize EFTs to pay their dues, fees, and ancillary service charges. At a minimum, there are tens of thousands of Class Members but very likely many more. The exact size of the proposed class and the identity of all class members can be readily ascertained from Defendants' records.

56. **Commonality.** Fed. R. Civ. P. 23(a)(2) and (b)(3). There are questions of law and fact common to the class, which questions predominate over any questions affecting only individual class members. Common issues include:

a. Whether Defendants were under a contractual duty to perform by providing health club access and services;

b. Whether Defendants breached their contract by failing to provide health club access and services, while continuing to seize funds from members through Electronic Funds Transfers;

c. The respective rights of the parties under any applicable membership agreements;

d. Whether any membership agreements outlined the duties and rights of the parties

in the event of a prolonged health club closure;

e.       Which version of Defendants' membership agreement, if any, governs dues, freeze
fees, cancellation fees, or other amounts paid for services promised on or after
March 16, 2020 while Defendants were not providing health club access and
services;

f.       Whether any provision in any applicable membership agreement contains a valid
agreement to arbitrate claims and/or class action waiver;

g.       Whether or the extent to which Defendants' statements, representations, and
material omissions regarding its policies and rights to continue charging dues,
freeze fees, membership cancellations, and other funds seized were false or
misleading;

h.       Whether Defendants' failure to issue refunds for amounts seized constitutes a
breach of contract, unjust enrichment, conversion, or a violation of state health club
or consumer protection law;

i.       Whether Defendants' conduct is violative of state health club laws and consumer
protection acts;

j.       The nature of the relief, including equitable relief, to which Plaintiffs and the class
are entitled.

57.     Typicality. Fed. R. Civ. P. 23(a)(3).  Plaintiffs' claims are typical of the claims of the Class
they seek to represent.  Plaintiffs and all Class members were exposed to uniform practices and
sustained injuries arising out of and caused by Defendants' unlawful conduct.

58.     Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).  Plaintiffs will fairly and adequately
represent and protect the interests of the members of the Class.  Plaintiffs' counsel is competent

and highly experienced in litigating class actions. Plaintiffs' counsel has litigated many dozens of class action cases, spanning decades, and Plaintiffs' experienced counsel is well suited, and has the resources, to represent the interests of this nationwide class.

59.     Superiority. Fed. R. Civ. P. 23(b)(3). A class action is superior to any other available means for the fair and efficient adjudication of this controversy. The claims of Plaintiffs and individual class members are small compared to the burden and expense that would be required to separately litigate their claims against Defendants, and it would be impracticable for class members to seek redress individually. Litigating claims individually would also be wasteful to the resources of the parties and the judicial system and create the possibility of inconsistent or contradictory judgments. Class treatment provides manageable judicial treatment which will bring an orderly and efficient conclusion to all claims arising from Defendants' misconduct. Class certification is therefore appropriate under Rule 23(b)(3).

60.     Class certification is also appropriate under Rule 23(b)(1), as the prosecution of separate actions by individual members of the class would create the risk of adjudications with respect to individual class members that would, as a practical matter, be dispositive of the interests of other members not parties to the adjudication and substantially impair their ability to protect those interests.

61.     Class certification is also appropriate under Rule 23(b)(2), as Defendants have acted and/or refused to act on grounds generally applicable to the class, thereby making final injunctive relief or corresponding declaratory relief appropriate for the class.

<u>**FIRST CAUSE OF ACTION – BREACH OF CONTRACT**</u>

120.    Plaintiffs restate all allegations in the Complaint as if fully set forth herein.

121.    Defendants explicitly and implicitly offered Plaintiffs health and fitness services,

including access to its health and fitness club(s), through a Membership Agreement.

122.    Plaintiffs and Defendants entered into a membership agreement whereby Plaintiffs would provide fixed monthly payments to Defendants in exchange for Defendants' services, which primarily involved the use of, and physical access to, Defendants' club(s).

123.    Plaintiffs accepted the terms of Defendants offer.

124.    Plaintiffs performed on the contract by making monthly payments to Defendants, which payments constituted due consideration.

125.    Defendants charged, received, and held Plaintiffs' monthly membership dues and/or additional fees, even though Defendants knowingly withheld performance on the contracts.

126.    Defendants breached its contracts with Plaintiffs by failing to provide the services for which it was obligated to perform, including the use of and access to Defendant's health clubs, when it closed its health clubs and prohibited access to its members.

127.    Defendants breached its contracts with Plaintiffs by wrongfully charging additional fees, such as cancellation, suspension, or "freeze" fees, even though Defendants failed to perform the services promised through the Membership Agreement.

128.    Plaintiffs and the Class suffered material damages as a result of Defendants' failure to perform on the contract.

129.    Plaintiffs did not accept any offers by Defendants to amend, modify, or supersede the Membership Agreement that was in force as of the date Defendants' breach, and any such unilateral changes Defendants imposed were violative of the existing, mutually bargained agreement.

130.    As a result of Defendants' breach, Plaintiffs and the Class are entitled to recover all membership dues and fees that were charged and taken from Plaintiffs by Defendants during the

period of closure without due consideration, with accrued interest.

## SECOND CAUSE OF ACTION – UNJUST ENRICHMENT

131.  Plaintiffs restate all allegations in the Complaint as if fully set forth herein.

132.  Plaintiffs conferred a substantial monetary benefit upon Defendants in the form of monthly membership dues and other fees during an extended period in which Defendants' clubs were closed to members and services not offered.

133.  Defendants knew that Plaintiffs remitted payment for monthly membership dues and fees during months in which Defendants' clubs were closed and its services were unavailable.

134.  Defendants knew that their services were unavailable and denied to Plaintiffs during the months for which Plaintiffs' conferred upon Defendants a substantial monetary benefit.

135.  Defendants received and responded to numerous complaints from its members, the media, and State Attorneys General, which included specific requests to refund members' monthly payments and other fees during the period in which Defendants' services were unavailable.

136.  Defendants knew and appreciated that because of widely disseminated public announcements from local, state, and federal government officials that its clubs were unlikely to reopen for a substantial period of time that would well-exceed the period covering any single member's monthly dues; Yet, Defendants accepted and retained payments from Plaintiffs and the Class anyway.

137.  Defendants laid off all staff and substantially cut overhead operating costs, while failing to offer promised services and continuing to extract tens of millions of dollars from members for services not provided.

138.    Plaintiffs and the Class were struggling during an uncertain time and gravely in need of cash and capital to meet pending financial obligations.  However, Defendants chose to take, and continue to take, Plaintiffs' money and use it for their own benefit.

139.    It was unfair and inequitable for Defendants to retain the benefit of Plaintiffs' membership dues and fees for services Defendants knowingly failed to perform and use that capital for the Company's own benefit.

140.    Plaintiffs suffered material damages as a result of Defendants' wrongful acts.

**THIRD CAUSE OF ACTION – CONVERSION**

141.    Plaintiffs restate all allegations in the Complaint as if fully set forth herein.

142.    Defendants took possession of property belonging to Plaintiffs and the Class in the form of monthly membership dues and fees to its clubs.

143.    After the clubs were closed, Defendants deprived Plaintiffs and the Class of their right and possession to their property without their consent and without lawful justification by refusing to provide a refund for the month of March and by continuing to charge accounts for dues and fees in subsequent months.

144.    Defendants exercised dominion and control over Plaintiffs' property and prevented Plaintiffs and the Class from accessing their property by prohibiting them from freezing, suspending, or cancelling their memberships.

145.    After Defendants' clubs were closed, Plaintiffs were the rightful owners of the excess funds under Defendants' dominion and control.

146.    Defendants received an onslaught of notifications and demands from its members, requesting the return of funds wrongly in their possession.  However, Defendants refused to return the funds to the rightful owners.

147.    Defendants appropriated Plaintiffs' property for their own use.

148.    Whether temporary or permanent, Plaintiffs did not consent to Defendants' interference with their private property, or any continued deprivation thereof, following the closure of Defendants' clubs.

149.    Plaintiffs suffered material damages as a result of Defendants' wrongful acts.

## FOURTH CAUSE OF ACTION – UNFAIR BUSINESS PRACTICES

### New York - Violation of NY CLS Gen Bus § 349

150.    Plaintiffs restate all allegations in the Complaint as if fully set forth herein.

151.    Defendants explicitly and implicitly represented to Plaintiffs that they would provide continuing health and fitness services, including access to and use of its health and fitness club(s), in exchange for certain specified, regular monetary payments.

152.    Defendants made materially misleading statements and omissions, which prevented Plaintiffs and the Class from cancelling their memberships or freezing their memberships without cost, leading to grossly excessive payments for services Defendants knowingly would not render.

153.    Defendants solicited such payments, and received such payments, directly from consumers.

154.    Defendants' acts and practices in offering continuing health and fitness services and receiving monthly monetary payments were consumer oriented.

155.    Defendants' acts, practices, and omissions in continuing to receive monetary payments from consumers while their services were knowingly discontinued was misleading in a material respect.

156.    Plaintiffs suffered, and continue to suffer, substantial monetary damages a result of Defendants' unfair business practices.

157.   Defendants knowingly and willfully violated this section by continuing to collect payments from consumers while its services were discontinued.

158.   Each Plaintiff and each class member are entitled to actual damages or $50, whichever is greater, as a result of Defendants' unfair business practices.

159.   Because Defendants' violations were willful, Plaintiffs and each class member are entitled to treble damages up to $1,000.

160.   Plaintiffs are entitled to reasonable attorneys' fees as a result of Defendants' unfair business practices.

161.   Plaintiffs seek the maximum amount of damages available by law for Defendants' unlawful conduct.

## FIFTH CAUSE OF ACTION – HEALTH CLUB SERVICE VIOLATIONS

### New York - Violation of NY CLS Gen Bus § 624 and 626

162.   Plaintiffs restate all allegations in the Complaint as if fully set forth herein.

163.   New York Law guarantees a health club service buyer the right to cancel a contract for health club services "[i]f the services cease to be offered as stated in the contract."

164.   New York Law also prohibits sellers of health club services to engage in unfair and deceptive trade practices, including misrepresentation of the nature and extent of services and the right of the buyer to cancel contracts.

165.   Defendants ceased offering health club services as stated in its Membership Agreements with Plaintiffs and the Class.

166.   Defendants continued charging and collecting from buyers' accounts following discontinuation of its health club services.

167.    Defendants prohibited and otherwise made it impossible for its buyers to cancel, freeze, or discontinue their contract during the period its health club services were discontinued, while continuing to charge those accounts.

168.    Defendants violated New York Law by prohibiting and otherwise making it impossible for Plaintiffs and the Class as buyers to cancel

169.    their contracts after Defendants knowingly ceased offering the health club services explicitly and implicitly offered in the contract.

170.    Defendants violated New York Law by misrepresenting the nature and extent of personal services that were available to buyers through continued monetary charges while Defendants' health club services were discontinued and its clubs non-operational.

171.    Plaintiffs and the Class suffered actual damages as a result of Defendant's violations.

172.    Defendants violations were knowing and willful.

173.    Plaintiffs are entitled to actual damages, treble damages, and reasonable attorneys' fees.

174.    Plaintiffs seek the maximum amount of damages available by law for Defendants' unlawful conduct.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the class of similarly situated individuals, hereby request that the Court:

(a)    Certify the case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, designate Plaintiffs as representatives of the class and designate the undersigned counsel of record as class counsel;

(b)     Order Defendants to provide actual damages and equitable monetary relief (including restitution) to Plaintiffs and class members and/or order Defendants to disgorge the profits they realized as a result of their unlawful conduct;

(c)     Order Defendants to pay punitive damages, as allowable by law, to Plaintiffs and class members;

(d)     Order Defendants to pay statutory damages, including multiple and/or treble damages, as allowable by the statutes asserted herein, to Plaintiffs and class members;

(e)     Declare Defendants conduct unlawful and enter an order enjoining Defendants from continuing to engage in the conduct alleged herein;

(f)     For both pre and post-judgment interest at the maximum allowable rate on any amounts awarded;

(g)     For costs of the proceedings herein;

(h)     For reasonable attorneys' fees as allowed by statute; and

(i)     Award such other relief as the Court deems appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and those similarly situated, hereby demand a trial by jury on all issues.

Dated: April 9, 2020                    Respectfully submitted,

**LIDDLE & DUBIN, P.C.**
by: /s/ Steven D. Liddle
*Steven D. Liddle
*Nicholas A Coulson
*Matthew Z. Robb
LIDDLE & DUBIN, P.C.
*Pro Hac Vice Applications to be Submitted*
975 E. Jefferson Avenue
Detroit, Michigan  48207
(313) 392-0025
sliddle@ldclassaction.com
ncoulson@ldclassaction.com
mrobb@ldclassaction.com